Carl, representing the Appellate Deer Farmers, quickly, you know, there's severe economic harm in this case. This is a very important industry, 1,287 jobs, $17.6 million of impact, and there's been lost sales, purchases, and lost profits since the 2022 Session Law Amendment and the Double Exclusionary Offense Policy Requirement. With respect to the Session Law Amendment, it includes a ban on new registrations and also restrictions on transferring to immediate family members. And if you have an immediate family member, only once. And the Double Exclusionary Offense Requirement was for two fences, a 96-inch fence and a 48-inch fence. This is basically as the State of Minnesota has admitted, they're trying to, you know, shut down the deer farming industry. So the first issue that I want to raise is the complete prohibition on occupation should be a fundamental right subject to strict scrutiny. As the Court knows, it is opined in the Singleton case that the Court, that basically the Court then can make clear that this right has been afforded substitute process protection only when the government completely prohibits rather than briefly interrupts the person engaging in his desired occupational field. So here we're talking about a permanent prohibition on Mr. Udovich, who wants to purchase a deer farm, a deer registration, deer farming registration, but he can't because he doesn't have one. And there are other limitations that we'll talk about more. So with respect to the question, okay, so we have a complete prohibition, so now should this Court, the panel, decide whether it's a fundamental right, which is important because it would be subject to strict scrutiny analysis. Mr. Cartl, would you agree that for us to determine whether it's a fundamental right, we need to do a Glucksburg analysis? Yes, and that would include reviewing the nation's history and tradition. Right. So what evidence do you offer to support the conclusion that raising deer as domestic livestock are rooted in our nation's history and traditions? Well, with respect to the, that we don't have, but we do have that people have a right to regulations, and we quoted in the brief a Benjamin Franklin quote, George Mason, who wrote the Virginia Declaration of Rights. We also have a quote from the Slaughterhouse case, which is included. And so there's a history of like accepting the regulation of professions, but in America, if we're going to have a statutorily defined occupation, then there can be conditions, there can be regulations, that anybody who meets the conditions and regulations can pursue it. So it's the pursuit of the occupation that's at issue. Very important fundamental thing. Now, I have the benefit, because the Minnesota statutes define deer farming as an agricultural pursuit, as an occupation, that it almost comes to like, okay, it's statutorily defined, so is the history in the United States, if we have a statutorily defined occupation, that everyone has access to it as long as they meet the conditions, the prerequisites, and also are willing to abide by the regulations. So big decision, but I have to move on to other things, too. Before you go, though, Kahn versus Gabbert. I don't know, you might have been quoting it earlier, but it says at the end, it talks about a generalized due price process right to private employment, but then it says, it is a right which is nevertheless subject to reasonable government regulation, which sounds to me like rational basis review. And I just want to, that's a 1999 Supreme Court case. Right. So the way that we've interpreted those cases is that it makes a distinction between a reasonable regulation and then saying, you, sir, or you, ma'am, cannot be a deer farmer. So there's a denial of access to the occupation for some. Those who already have it are already in pursuit. So that's not a regulation, that's a complete prohibition for that particular person. Now, one might say, well, it depends on the eyes of the beholder, the government's view. Well, some people are still deer farming. But from the individual's view, I'm prohibited from that occupation. And traditionally in America, we have a, we take the view of the government sometimes, we take the view of the individual sometimes, but we never completely exclude the individual view. And that's where I think, when you're reading the U.S. Supreme Court precedents animated by that principle, that no single person or group of people can be targeted and said, you can't pursue this occupation that's pursued by others. So that would be a type of complete prohibition, even though I know there's an exception for those people. But even those people have an end. How far does that go, though? Does it go to unreasonably dangerous activities? I know this is different. I'm not suggesting it's the same. But could somebody bring a due process claim that the government has prohibited them from, you know, from working on and creating nuclear weapons, for example, and say, well, that's my chosen field of employment. I want to do that. And so, therefore, that regulation is invalid. The, yeah, that would be going, I guess, too far in a sense in that, with respect to allowing some people to do that, would be required conditions and the reasonable regulations to talk about. That's another thing to say, the only people that will be that type of scientist will be people with their name start with A through K. That, well, they're completely prohibited from an occupation that people with a surname L through Z can pursue. So this is quite arbitrary. Udovich, for example, has quite a longstanding history of being a deer farmer, got out of it, now he can't get back in. So I would hope that we would consider an individual, say, a great scientist like Einstein, would be prohibited under such a rule because his surname starts with a certain letter, that he would have a right to access the occupation, pursue it, because it would be useful. So there's a sense to that. I think on the, we move forward to the equal protection clause in one argument, you know, it's not so much about the case law, it's more about exactly how this works. So why are they similarly situated? How does that support the preferential treatment shown to some rather than others? So the deer farmers, many of them are here because of the way it works. Bloom, Clark, Evans, Feer, Porter, Uchtdell, and Williams have immediate family members. Robicoff, Clark, and Evans do not have an immediate family member. Who desire to buy or have transferred them an existing registration. Collins, Augrey, Buchner, and Halthose have no family member, immediate or otherwise. Augrey, Collins, Olson, Medichick, Robicoff, Clark, and Evans cannot sell or transfer their respective registration to anyone else, that is to a non-family member. Then of course, a few, Feer, Porter, Boone, Clark, Evans, Graves, Hanson, Robicoff, and Hanson can sell to a family member, but only once, and then that couldn't be forwarded on. Now, Udovich- Counsel, why do you say only once? Because the statute says you can give to a family member, but that type of transfer can only be done once. And so then Udovich, it's interesting, we didn't mention in the brief, but Udovich is always lingering out there as a non-registered person, and so he can't receive or buy the Deere farm registration like the immediate family members can. And so that's another example, like there's two sides to the transaction. And then with respect to the fencing requirement, you know, I got to tell you, I've been practicing a long time, and I had a tough time giving up on the property rights regime, but when we moved to property interests, I was assured by the Administrative Law Scholars, well, at least you'd get a hearing before they did anything affecting your property interests. So here, the DNR had issued on its website, the particular regulation restricted the exclusionary fencing without a hearing. I'm not saying that we're going to try to regulate the state legislature. The state legislature can do what it wants, but when these executive branch officials, including in the cities and in the counties, in the townships, school districts, when they're doing things that directly affect people's property interests, here are approximately 100 Deere farms, and they're going to mandate fencing being put up. That is a property interest, and that's a direct instruction under penalty of citation. Also when you look at the website, though, and it has all the disclaimers, it looks like a super Miranda warning, you know. It has all the disclaimers here, no force in effect of law, informational only, doesn't create any criteria. I won't read them to you because they got overkill to the max degree. Why doesn't that, though, say that this is not a regulation? Well, it's certainly being used because my clients are being cited in those citations, so that's the practical aspect, but this is... And the evidence of that's in the record? That they're being cited based on this Deere fencing, what's it called? Either citations or warnings are in the record, so the citations, there's a hearing coming up. But do they cite this as their authority? You know, the page of the website? Not that I recall, but it's the same issue with respect to the force of law, and so anyway, that was the issue. I wanted to talk about that a little bit. Then the Court indicated, I spent a whole day yesterday thinking about this, with respect to the standing, Article 3 standing requirements, and that's a really important issue that... So with respect to the standing, the first thing is that Article 3 requires, you know, concrete injury, and then the second thing, when I was thinking about that, is that in a case where you don't have a claim for damages, how do you present to the Court the facts that support the concrete injury the Court's looking for? So it almost should be in the jurisdictional paragraph, you know, you have subject matter jurisdiction, you have venue, then there should be an Article 3 standing paragraph. Regrettably, that wasn't in our complaint, but it should have been. So one way to look at it is, well, okay, how do we get to the nuts and bolts of the traditional harm we're looking for, physical harm, economic harm, or intangible harms? And we can be reminded of 43 U.S.C. 1988 basically says, well, the Court's looking at these claims, it's not clear from the statute, you can look to the common law. So there's some cases that help us. Recently, in the Southern District of Iowa, Islands for Alternatives to Smoking and Tobacco, Inc., I'll just quote it, plaintiffs have demonstrated concrete injuries that readily satisfy the injury and fact requirement. Manufacturer and retailer plaintiffs face substantial economic harm, including lost sales, customers and goodwill, if House File 2677 takes effect. Such economic injuries represent paradigmatic examples of concrete harm sufficient to support standing. There, the law prohibits the sale of e-cigarettes and vape products unless their marking was federally approved. So then, but you've got to keep going. So then the next thing is, okay, well, why would this be economic harm? And then in Minnesota, there's a recognition of atrocious interference with prospective business relations. So if you imagine my clients want to do business with Udovich, they want to do business with other people not registered, they want to sell their herds, sell their registrations. So that would be a lost sale. And for Udovich, a lost purchase. And you might make money because you might purchase and sell. And so that's how the economic harm works. And then with respect to prospective and speculative, you know, in Twin Cities Underwriters, Inc., a 2024 Minnesota appeals case, it references lost profits under Minnesota law. So it's a concept the Court's aware of that it exists. On that issue, I just want to, I want to press you because on the Udovich thing, on substantive due process, I think you've got to look at it claim by claim under TransUnion and some of the other cases. But I think what ultimately comes about is that you probably have at least one plaintiff with standing on every claim, but not every plaintiff has standing on every claim. And I'll give you an example. For substantive due process, I think it's probably Udovich who's the only one that has standing on that one because he's the, because the claim is I'm barred from entering into the profession or, or, or buying a farm or whatever. For that claim, Udovich is the one who's being prevented. So what do we do if, if there's standing by at least one of the plaintiffs, but some of the plaintiffs don't have standing for particular claims? Right. So on Udovich and the lack of occupation, I understand that, and I'm prepared because I got a note before the hearing. At Udovich, the, you know, it's interesting, you know, you have the Virginia Board of Pharmacy case saying, hey, look, under the First Amendment, the communication is protected, so either the transmitter or the recipient can bring the claim. So with respect to the registration of Udovich, once he's registered, he can purchase from anybody. And so it's really what's happening is that the sale and purchase are being prohibited by the state, and so both the person selling Udovich and Udovich have standing further. My clients, you know, they like to take vacations, too, and they could take a break, get out of deer farming, and they might want to come back to deer farming. And so that's, that's important to think about. And then, and then with respect to the other claims, which I've got notes here, I want to mention the association, because there's a new case law on association standing, that this would be a classic prototypical associational standing. They've organized to defend the industry, to promote the industry. They're losing members because people aren't registering to deer farmers. They're losing, they're representing the clients with respect to their profit-making activities, and they're being denied that. So on all these claims, the association has standing. I see my time is up. Thank you, counsel, for the argument. Mr. Pulitzer. Good morning, Your Honors. Phil Pulitzer, Assistant Attorney General representing the State Defendants, Commissioner of the DNR, and members of the Board of Animal Health. The State Defendants are asking this Court to affirm the lower court order granting the State's motion to dismiss. This Court should affirm for at least two reasons. There is no fundamental right or suspect classification implicated by this law, and the law meets rational basis for view in its efforts to combat chronic wasting disease. Chronic wasting disease, or CWD, is a deadly, highly infectious disease affecting a cervidae, including white-tailed deer. The disease threatens to ravage the State's wild white-tailed deer herd and decimate the economy and cultural resources that rely on this pristine resource. CWD is particularly concerning to the State of Minnesota, both because of the culture and the economy around deer hunting, and it's a significant economic driver as well. There's also the public health concerns that were expressed to the legislature, and so the law at issue here seeks to balance these various interests, addressing the spread of CWD, protecting the economic and cultural interests, while grandfathering in existing deer farms. I think the argument, though, to the other side, and I want you to be able to address it, is this is, A, it's a complete ban, which potentially poses a problem, and B, there is some suggestion that it's arbitrary, just taking a group of people, it's like A through E in the alphabet, was how it was described, and I want to give you a chance to respond to both those points. Yeah, you know, in terms of being a complete ban, the plaintiffs in their brief admit that the State could do a complete ban, and the parties don't dispute that we could completely outlaw the practice of deer farming. What my colleague on the other side mentioned during his argument was that the issue is that no one new can pursue this, and that for me raised the question of grandfathering. You know, can the government put up barriers to new entrants into the field? And that is a type of regulation that this Court and the Supreme Court has blessed for a number of years. The Minnesota v. Cloverfield dairy case stands for the proposition that it's permissible for the Court to bar new entrants into the field. That case relies on the City of New Orleans v. Duke's case. I'd be happy to submit a 28-J letter with that citation, as well as this Court's decision in the Kansas City Taxi Driver Association. So the idea that the government is prohibited from barring new entrants to the field is a resolved question in this circuit. Getting back to the arbitrariness allegation, is there any evidence in the record to support the view that banning deer farming is going to stop the spread of this disease more than perhaps exterminating the wild population? Or is there some connection between domesticated deer and the disease? Certainly, Your Honor. You know, I would point to, you know, talk about what the law does and what it doesn't do. And the way that the legislature crafted this legislation, it started with research. It conducted a legislative report that looked at the impact of deer farming. And what it found was when a wild deer comes down with CWD, that deer is going to die. But it's going to die in its home range, which is a few miles, maybe 10 or 12 miles. But that same deer, if it was a farmed deer, it still will die, but it might be moved hundreds of miles throughout the state. So the movement of the deer that is associated with farmed deer was a real concern. And you couple that with the fact that CWD has a 18 to 30 to 3-year incubation period before you might find symptoms that are visible. The movement was a particular concern of deer farms. So with that, the legislature took the approach of grandfathering in existing deer farms, allowing a one-time transfer to immediate family members, while preventing new entrants into the field consistent with the precedent I spoke of earlier. It increased fencing requirements to provide additional regulation and some additional CWD requirements. But it does not require the culling of any new herds. It does not order the shuttering of any existing herds or existing farms. So as it relates to the substantive process claim, we're looking at, again, Judge Grassley, with the standing suggestion that that was the State's position, that there's probably one good plaintiff. That's why we didn't raise it in our briefing. But the substantive process, as it relates to Mr. Udovich, you know, what the claim there is that, you know, the State took this incremental step to address the scourge of chronic wasting disease. And the incremental step that it's taken is to not allow new entrants into the field. And that's subject to rational basis review. And the incremental step approach is, it was sanctioned by this Court in the Hawkeye decision that dealt with the problems of gambling games. And the challenge there is, well, why not get rid of all gambling games? And the Court blessed the practice of taking an incremental approach. And then I'd also turn back to the Cloverleaf case that allows for that incremental approach to be barring new entrants into the field. You know, on the next one, I was just going to ask, follow up on the standing point really quickly, which is, you know, if there are several plaintiffs that don't have standing for particular claims, would the appropriate disposition in the State's view be to dismiss those plaintiffs as to those claims from the case? Or I'm just trying to figure out, it becomes an issue when you have so many plaintiffs. Certainly. And certainly it's the plaintiff's burden to establish standing. But I think substantively on the merits is where we've focused. And to go a little deeper, we've got two defendants here, too. The Board of Animal Health, one of the things that the statute did was shift authority from the Board of Animal Health to the DNR. So the authority here rests in the Department of Natural Resources and not in the Board of Animal Health. So there's no standing to sue. There's no injury that has flowed from the Board of Animal Health. Dismissing those parties from that claim, but they might still have standing as it relates to an equal protection claim because, you know, so I think the nuances might be beyond me right now, but I'm happy to provide supplemental briefing if it was requested. On the procedural due process claim, I don't think there is any standing. There's been no injury, in fact. The process that's afforded by the legislative deliberations is all that's processed as due under the Constitution. And What about the citations or the warnings? I mean, it looks like even if it's just for information, it appears that, you know, some agency has taken it pretty seriously. Certainly. And, you know, this is the catch-22 the government's often placed in where the regulated industry may seek guidance and the government is, you know, wants to give guidance but perhaps its lawyers say, you know, you don't want to step on any unpromulgated rule-making toes here. So what the agency did in this case was provide examples of fencing that has been approved in the past. So it's somewhat like a library. In the past, this has been the type of fencing that we have authorized. As it states on the website, the lengthy caveats and exclusions, it also indicates that the fencing will be evaluated on a case-by-case basis. Because what the statute says, the language of 35.155 subdivision 4, the authority amended language says that the fencing must prevent physical contact between wild deer and farm deer. And that's certainly rationally related to preventing the spread of chronic wasting disease. If you, I believe this is in our brief, it certainly was at the district court, but the testimony from the legislature when these amendments were being evaluated noted the have foodstuffs there, there's, perhaps it's mating season. These are, these are, could be attractive to wild deer. So that's where the physical barrier was included in the legislation. But does that give rise, I guess my question is, if they are being cited, does that give rise to at least standing and potentially a procedural due process issue if it has, if it's somewhere between the force of law and being advisory? No. Because the citations are not for violation of www.dnr.gov. The violations are for 35.155 subdivision 4. A conservation officer was out at the site determined that, and this is outside the record, but these are contested case hearings that are being initiated at the Minnesota State Office of Administrative Hearings. But so I want to be sure I'm answering your question fully here. The citations relate to the violation of the law, not the informational materials on the website. Counsel, I'd like to go back to the nature of the right at issue. And twice in the state's brief, you say that there is no constitutional right to farm. Is it the position of the state of Minnesota that the legislature could, if they wanted to, entirely ban the raising of livestock and not violate the Constitution? This Court has held in the Plume decision that there's no fundamental right to farming. Okay. So that's where I was going. I disagree with that interpretation. I think in Plume we held that there was no constitutional right to grow hemp. I think anything beyond that is dicta. Okay. There was no Glucksburg analysis done in that case as to the right to farm in general. Fair enough. The quote from the Plume case perhaps goes beyond saying there's no fundamental right. But I would still suggest that that would, the context of banning that type of activity would also, you know, is there an infectious disease that is rationally related? Well, let's suppose that the legislature decides that to combat climate change, they're going to ban the production of all beef in Minnesota. Would that implicate the Constitution? It would certainly raise, be subject to rational basis review, and the question would be You don't think that there's a deeply rooted right to raise livestock embedded in our nation's history? I think it would involve that Glucksburg analysis, yes. And I would turn to the Plume case, which I don't have in front of me to push back on the suggestion that it's not, that perhaps that's just indicative of Judge Grasso. I'll take your interpretation of that. But I think one of the distinctions there between that case and this case is that the parties have acknowledged that there is the ability of the States to do a complete ban. And so in that context, this would be distinguished from the hypothetical, because we've allowed the grandfathering of certain operations. So that would be my response. And turning to the equal protection claim, this provides for a one-time transfer of registrations to immediate family members. And so that's the alleged discrimination here. But this, again, would be subject to rational basis review. And the State of Minnesota has a long history of farming and a long history of legislation that promotes the family farm. So this is simply the legislature continuing that practice. The legislature could have concluded that deer farming is a family-oriented practice and rationally have chosen, rather than to not allow any transfers, to allow a single transfer to immediate family members. I cite to the Corporate Farms Act in the brief, there's also an agricultural homestead exemption for family farms. So this is simply an additional example of the State legislature choosing to prioritize and give a benefit to a family farm where it perhaps provides an additional tail on the phase-out to recoup an investment, to transition property or land to other valuable uses. And I touched on the procedural due process. And I think the procedure that occurred at the legislature is adequate. And, Your Honors, this case comes down to the State of Minnesota balancing its various interests in an attempt to limit the spread of a dangerous disease that could really decimate its wild, white-tailed deer herd. The State's efforts have been reasonable and constitutional. And we ask this Court to affirm the district court's order. I'll defer my time unless there's any further questions. Thank you. And thank both Counsel for the arguments here today. Case number 24-2845 is submitted for decision by the Court. Miss Hyte.